ENGLISH v. BRITT

[121 N.C. App. 320 (1996)]

———

SANDRA ENGLISH, Petitioner v. C. ROBIN BRITT, Secretary, North Carolina Department of Human Resources, and MARY DEYAMPERT, Director, Division of Social Services, North Carolina Department of Human Resources, in their Official Capacities, Respondents

No. COA95-123

(Filed 2 January 1996)

## Social Services and Public Welfare § 23 (NCI4th)— institutionalized spouse—spousal support terminated—insufficiency of evidence to support termination

The final decision of the Department of Social Services upholding termination of the spousal allowance for the wife of an institutionalized person receiving Medicaid was not supported by substantial competent evidence in the record, since there was evidence that the institutionalized spouse wanted his "money," but there was no evidence that he intended to apply all of his income, exceeding his personal needs allowance, to his nursing care rather than toward the support of his wife.

**Am Jur 2d, Welfare Laws § 40.**

Appeal by petitioner from order entered 14 November 1994 by Judge W. Osmond Smith, III, in McDowell County Superior Court. Heard in the Court of Appeals 26 October 1995.

*Legal Services of the Blue Ridge, Inc., by Samuel F. Furgiuele, Jr., for petitioner appellant.*

*Attorney General Michael F. Easley, by Assistant Attorney General Belinda A. Smith, for the State.*

SMITH, Judge.

This pauper appeal involves Medicaid law and regulations which pertain to persons who are institutionalized, receiving Medicaid benefits, and have spouses still residing in the community (community spouse). An institutionalized spouse, at his discretion, may provide some amount of income for the support of his community spouse, instead of having all of his income applied to the cost of the institutionalized care. 42 U.S.C. § 1396r-5(d)(1)(B) (1995).

In this case, Sandra English, petitioner, is the community spouse of Herdie English, an institutionalized Medicaid recipient. Mr. English entered McDowell Nursing Center in May 1992. At that time, Mrs. English filed an application with the McDowell County Department of Social Services (DSS) for medical assistance for Mr. English. Based upon his income, Mr. English qualified for Medicaid. Except for a "personal needs allowance" of $30.00 per month for Mr. English's personal use, the rest of his income, $508.00 per month Veterans Administration benefits and $404.80 per month social security benefits, was established as Mrs. English's community spouse allowance. Mr. English was, therefore, not required to pay any of the cost of his nursing care. In January 1993 Mr. English received a cost of living increase in his income. As a result, his personal patient liability was assessed to be $20.00 per month.

In the spring of 1993, Mr. English complained to nursing center personnel that he was not receiving any money. The complaint was reported to the McDowell County DSS on 1 April 1993. Medicaid caseworker, Leah Robertson, visited Mr. English in the nursing center. After discussing with Mr. English the failure of his wife to provide him his personal needs allowance, Ms. Robertson directed nursing center personnel to prepare two letters for Mr. English's signature. The letters redirected his Veterans Administration check and his social security check, previously mailed to Mrs. English, to the nursing center. On 10 September 1993, the McDowell County DSS was appointed guardian over Mr. English and his estate, after he was determined to be incompetent.

Ms. Robertson interpreted Mr. English's request for money as an instruction to cut off Mrs. English's spousal allowance and took the necessary steps to ensure that the spousal allowance was terminated. As a result, Mr. English's patient liability of $20.00 per month was increased to $834.00 per month which was all of his remaining income, except his personal needs allowance. The increase was effective in May 1993.

On 14 July 1993, Mrs. English filed an administrative appeal, contesting termination of her spousal allowance. After a 19 July 1993 hearing a decision upholding termination of the spousal allowance was issued. Mrs. English appealed that decision to the North Carolina Department of Human Resources (DHR). A hearing was conducted on 17 September 1993 before hearing officer Clarissa Brady. Officer Brady upheld termination of the spousal allowance by decision dated 1 November 1993. Mrs. English appealed Officer Brady's decision to Ms. M. Vicki Thaxton, Interim Chief Hearing Officer of the DHR, Division of Social Services, who by decision dated 3 January 1994, upheld the allowance termination. Mrs. English then appealed to the Superior Court of McDowell County. The case was heard on 17 October 1994. The superior court issued an order dated 14 November 1994 upholding the allowance termination. From that order, petitioner, Mrs. English, appeals. She contends that the final decision of the DHR, Department of Social Services, upholding termination of spousal allowance was not supported by substantial competent evidence in the record, in that there was no substantial evidence of intention by Mr. English to terminate such support.

Our review, as well as that of the superior court, is governed by N.C. Gen. Stat. § 150B-51. That section provides that the court reviewing an agency decision may affirm or remand the case. It may also reverse or modify the agency's decision if the substantial rights of petitioner may have been prejudiced if, among other reasons, the agency's decision was unsupported by substantial evidence in the record. N.C. Gen. Stat. § 150B-51(b)(5) (1991). *See Dockery v. N.C. Dept. of Human Resources*, 120 N.C. App. 827, 463 S.E.2d 580 (1995); *In re Appeal of Ramseur*, 120 N.C. App. 521, 463 S.E.2d 254 (1995); *Brooks v. Rebarco, Inc.*, 91 N.C. App. 459, 372 S.E.2d 342 (1988).

The appropriate standard of review depends upon the basis of the petitioner's challenge. Allegations that the agency decision is affected by errors of law require *de novo* review. *Id.* When petitioner alleges that a final agency decision is not supported by substantial evidence

**ENGLISH v. BRITT**

[121 N.C. App. 320 (1996)]

in the record, the reviewing court must apply the whole record test. *Walker v. North Carolina Dept. of Human Resources*, 100 N.C. App. 498, 502, 397 S.E.2d 350, 354 (1990). Petitioner's contention in this case that the DHR decision is unsupported by substantial competent evidence requires application of the whole record test. The whole record test dictates that the reviewing court "examine all competent evidence to determine if there is substantial evidence to support the administrative agency's findings and conclusions." *Henderson v. N.C. Dept. of Human Resources*, 91 N.C. App. 527, 530, 372 S.E.2d 887, 889 (1988). "Substantial evidence is that which a reasonable mind would regard as adequately supporting a particular conclusion." *Walker*, 100 N.C. App. at 503, 397 S.E.2d at 354.

At the hearing, Officer Brady made the following pertinent finding of fact and conclusion of law, which were adopted and upheld by Interim Chief Hearing Officer Thaxton:

> 11. Mary Manley [*sic*] and the caseworker testified at the hearing that Mr. English stated on April 1, 1993 that he wanted all his money to be used for his cost of care at the nursing home.

\* \* \* \*

#### CONCLUSIONS

> . . . . The county did not appear to influence his opinion but informed him of his possible options due to their not being able to contact his wife, Sandra after several efforts. Mr. English made the decision that was in his best interest at that time.

After careful review of the entire record in this case, we can find no substantial evidence to support decisive finding of fact number 11. Further, there is no evidence to support the above conclusion of law, better labeled a finding of fact, that Mr. English was informed of his possible options. In fact, all the evidence is to the contrary. If he had been apprised of all available options, he would have realized terminating the spousal allowance and redirecting his checks was not in his best interest because payment delays resulting from such action put him at risk of being discharged from the nursing center. Because we can find no substantial evidence to support the decision of the DHR, we reverse.

At the hearing before Officer Brady, the McDowell County DSS, as Mr. English's interim guardian, attempted to ratify his "decision" to terminate spousal allowance to his wife, stating that they were "going

by his wishes." The DSS failed to bring Mr. English to the hearing; however, four witnesses testified concerning alleged statements he had made regarding his wishes: Leah Robertson, the DSS caseworker; Mary Maney and Gwen Conley, employees of the nursing center; and Mrs. English. Ms. Robertson testified twice during the hearing. Initially, she described her conversation with Mr. English as follows:

> He seemed calmed, and he had just stated to me that he was tired of not having any money. And I explained to him that the money could be deemed to his wife, or that the money could go for his cost of care at the nursing home. That he was entitled to $30.00 a month for personal needs, and he said I want my money.

Ms. Robertson's statements did not represent all of the options available to Mr. English. Ms. Robertson admitted during the hearing that Mr. English could have had all of his checks redirected to the nursing center to assure receipt of his personal needs allowance, without terminating Mrs. English's spousal allowance. However, she failed to explain that fact to him during their conversation. Furthermore, it was not explained that, by cutting off the spousal allowance, he exposed himself to greater patient liability for nursing care costs or that delay in rerouting his checks would place him at risk of being discharged from the facility for lack of prompt care payment.

Mr. English's statement, "I want my money," in no way suggests that he wished to terminate the spousal allowance. Mr. English may very well have been referring to his personal allowance.

When nursing center employee, Mary Maney, was asked to describe the conversation she heard between Ms. Robertson and Mr. English in every detail, she described the following exchange:

> And she was asking him and he was telling her that, you know, he wasn't getting any money. He wasn't happy about it, and she asked him if he wanted his money to come to the nursing home, and he stated yes.

When asked whether Mr. English expressed any desire about his wife's spousal allowance, Ms. Maney admitted that she did not explain to Mr. English that his wife would not receive her spousal allowance because she did not know it herself.

Gwen Conley, another nursing center employee, described conversations she had with Mr. English as follows:

Ms. Conley: I had talked to him and I asked him before. I said, "Would you like your money to come to you?" And he said "yes." And I told him that I would try to arrange it to where his checks could be sent to him directly at the nursing center. Would he like that, and he said "yes." So, we had the letters typed up, and then I read the letters to him and asked him if he understand [*sic*] and he said "yes" and went and signed them.

Mr. Lynch: Just from based on your own recollection do you remember whether it was explained to him that once he sent these letters that she would not be receiving any money?

Ms. Conley: I didn't know at the time.

Ms. Robertson, the DSS caseworker, testified again following the testimony of Ms. Maney and Ms. Conley, changing her account of the conversation she had with Mr. English. She described the conversation as follows:

He stated to me that he wanted his money. I explained to him that he was only entitled to $30.00 of the money he received, that the money was going to Mrs. English and that she was accountable for the $30.00. He said he wasn't getting any money, and he wanted all his money to come there. I said, do you want your money to come to you to be used for your cost here at the nursing home, and he said "yes."

Assuming *arguendo*, that Ms. Robertson's second description is accurate, there is still no showing that Mr. English intended to terminate spousal allowance to Mrs. English or that he understood the consequences of such action. There is no mention of spousal allowance in this statement, nor is there an explanation of the phrase, "used for your cost here at the nursing home." It is not clear from Ms. Robertson's first or second version of her conversation with Mr. English that he knowingly expressed any desire to discontinue the spousal allotment.

Finally, Mrs. English's uncontradicted testimony regarding her husband's reaction when she told him what had happened to her allowance was as follows:

Mr. Furgiuele:  Okay. What I'm asking is has he ever said to you whether he wanted you to have any of this money to use?

Mrs. English:	No, he didn't say until later. He found out that they were taking the income. He was very upset about it.

Mr. Furgiuele:	What did he say to you?

Mrs. English:	He wanted to give me some money, and I told him . . . . (ellipsis in original)

The record is clear that Mr. English wanted his "money." However, the record is devoid of any substantial evidence that he intended to apply all of his income, exceeding his personal needs allowance, to his nursing care, rather than towards the support of his wife. Mrs. English testified that he was upset when he found out what had happened to her allowance. Without substantial, competent evidence in the record supporting Mr. English's alleged decision to terminate Mrs. English's spousal allowance, the DHR decision cannot be upheld. For the reasons stated herein, the final decision of the DHR is reversed. Based on the foregoing, it is unnecessary to address petitioner's other assignments of error.

Reversed.

Judges JOHNSON and WALKER concur.